GROSSET & DUNLAP, INC., Plaintiff,

v.

GULF & WESTERN CORPORATION and Stratemeyer Syndicate, a partnership, Defendants.

Nos. 79 Civ. 2242 (RJW), 79 Civ. 3745 (RJW).

United States District Court, S. D. New York.

March 17, 1982.

Coudert Brothers and Moses & Singer, New York City, for plaintiff; Carlton G. Eldridge, Jr., Pamela G. Ostrager, Peter L. Edwards, Stanley Rothenberg, Arthur F. Abelman, New York City, of counsel.

Dennis Angel and Proskauer Rose Goetz & Mendelsohn, New York City, for defendants; George G. Gallantz, Jeffrey A. Mishkin, Maxine A. Paul, New York City, of counsel.

ROBERT J. WARD, District Judge.

This is an application by defendants, prevailing parties at trial, for an award of attorneys' fees pursuant to section 505 of the Copyright Act of 1976, 17 U.S.C. § 505. In its findings of fact and conclusions of law, delivered orally at the close of trial, the Court determined that defendants were entitled to an award of attorneys' fees and directed them to submit an appropriate fee application.

Before the Court are (1) defendants' motion for a determination of the amount of attorneys' fees to be awarded and (2) that

portion of plaintiff's motion pursuant to Rules 52(b) and 62(b), Fed.R.Civ.P., to amend the findings of fact and conclusions of law delivered orally on June 12, 1980, and the judgment entered thereon on July 9, 1980, by striking the award of attorneys' fees to defendants. The balance of plaintiff's motion was ruled on by the Court at oral argument on October 29, 1980, and the findings of fact and conclusions of law were modified accordingly by an order signed on February 9, 1981. For the reasons that follow, defendants' motion is denied, and the heretofore undecided portion of plaintiff's motion is granted. The Court's earlier determination to award attorneys' fees to defendants is vacated.

### The Underlying Litigation

In this action, the Court was faced with difficult factual questions of contract interpretation concerning who controls the publication rights to some of the most widely read series of children's books of the twentieth century. The principal dispute in this action grows out of a 1930 contract ("the 1930 agreement") entered into by plaintiff with Edward Stratemeyer ("Stratemeyer"), the predecessor in interest to defendant Stratemeyer Syndicate ("Syndicate"), and a 1931 contract ("the 1931 agreement") between plaintiff, the estate of the then-deceased Stratemeyer, and Syndicate. Stratemeyer was the creator of, among many others, the series of children's books known as "The Bobbsey Twins Books," "The Hardy Boys," "The Nancy Drew Mystery Stories," and "The Tom Swift Books." The creative genius of Stratemeyer spawned the now-famous characters that the stories are about, together with the well-known pen names under which the stories were written.

In the 1930 agreement, Stratemeyer granted plaintiff the exclusive right to publish, in book form, the stories named in that agreement. The parties agreed that the books would only be published in hard-cover, or cloth, form. Stratemeyer died approximately two months after executing this agreement, leaving all "copyrights, bookrights, [and] printing plates" to his wife, who in turn granted the exclusive rights to Stratemeyer's stories to her and the creator's two daughters. The daughters, Harriet S. Adams and Edna C. Stratemeyer (later Edna C. Squier), organized Syndicate, a partnership, to carry on their father's business.

The 1931 agreement, executed just over one year after Stratemeyer's death, replaced the 1930 agreement, but essentially carried forward the terms and provisions of the earlier contract. Plaintiff was again granted exclusive "rights of book publication only," in cloth form. The 1931 agreement, which, like its immediate predecessor, covered the Bobbsey Twins, Hardy Boys, Nancy Drew and Tom Swift series, among others, is silent on the question whether plaintiff was granted publication rights for the copyright renewal terms of the stories covered by the agreement. As the Court determined after considering the evidence adduced at trial, however, a number of original copyrights were renewed during the period 1931 to 1978, and with Syndicate acquiescence (and acceptance of royalties) plaintiff continued to publish and sell the books. The Court found that this course of conduct demonstrated an intent to include in the 1931 agreement's grant of hard-cover publication rights, publication rights for the copyright renewal terms.

At the time of the 1931 agreement plaintiff was selling the Stratemeyer books, in cloth form, for the retail price of fifty cents. At that time, the paperback book market did not resemble the paperback market as it exists today, and none of the Stratemeyer books were being sold in paperback form. As the Court found after trial, Syndicate did not grant paperback publication rights to plaintiff. The market for paperbacks, as the term paperback is now understood, came into existence around 1939. In the early and mid-1930s, as the Court stated in its findings of fact, paperbacks were referred to in the United States, often pejoratively, as "dime novels" and at earlier times as "penny dreadfuls." The Court found that Stratemeyer and Syndicate, thus concerned about their reputation, specified publication in cloth form only to

prevent plaintiff from publishing the stories in paperback form. However, the Court also found that, in obtaining a commitment from plaintiff to publish the stories covered by the 1930 and 1931 agreements, and by a similar 1934 agreement ("the 1934 agreement"), in hard-cover form only, Stratemeyer and Syndicate agreed by implication not to publish or to license anyone else to publish the stories as paperbacks.

For over forty years after the 1931 and 1934 agreements were executed, Syndicate and plaintiff operated under the terms of these agreements. Syndicate submitted to plaintiff new stories in the series covered by the agreements, and, once accepted, the stories were published by plaintiff in hard-cover form as additions to the series. Plaintiff argued at trial that the 1931 and 1934 agreements granted it the exclusive publication rights to all books in the series mentioned in those agreements, including any and all stories added to any of these series thereafter. The Court, however, found otherwise, holding that the stories not named in the agreements, and added to the series later, were published by plaintiff pursuant to individual implied-in-fact agreements, containing the same terms as the 1931 and 1934 agreements, for each of the later stories. Each such implied-in-fact agreement, the Court found, arose from the delivery to plaintiff of the manuscript of a Syndicate story and the subsequent hard-cover publication of the story by plaintiff with Syndicate's consent. The evidence demonstrated further that plaintiff was under no obligation to accept a Syndicate manuscript for publication or to continue publishing any given Syndicate story for any particular length of time.

This action had its genesis in a decision by Syndicate, unhappy about the royalties it was being paid by plaintiff, to publish through Simon & Schuster, an unincorporated division of defendant Gulf & Western Corporation, new stories in some of the series that up to that point had been published by plaintiff. As of the time of trial Simon & Schuster had published six new Syndicate stories, all in paperback form, four additions to the Hardy Boys series and two additions to the Nancy Drew series. The Court determined that Syndicate was contractually free to have new stories added to its series published by publishers other than plaintiff, and that Simon & Schuster had neither infringed any copyright nor otherwise acted improperly in publishing the six new Syndicate stories. But the Court also held that, although plaintiff had not been granted paperback publication rights for those stories it had already published in hard-cover, Syndicate was not free to grant paperback rights to those stories to anyone other than plaintiff.

### The Copyright Claims

In the course of this action, plaintiff presented three statutory copyright claims, which form the basis for defendants' present application for attorneys' fees pursuant to section 505 of the Copyright Act of 1976, 17 U.S.C. § 505. These claims were based on (1) joint copyright under 17 U.S.C. § 101; (2) divisibility of copyright and copyright in characters under 17 U.S.C. § 101 and § 201(d); and (3) works for hire under 17 U.S.C. § 304. Plaintiff used these claims in various combinations to argue (A) that plaintiff was a copyright proprietor of the early Stratemeyer stories published pursuant to the written agreements, as well as of the new stories published by plaintiff; (B) that plaintiff's "exclusive right" in the series continued into the renewal terms of copyright with respect to each series story published by plaintiff; and (C) that publication by Simon & Schuster, pursuant to agreement with Syndicate, of new stories containing characters, character names, relationships, locales, etc., from the series, infringed plaintiff's rights under the copyright laws.

### 1. Joint copyright

The Court ruled that plaintiff was not a joint copyright owner of any Stratemeyer story by virtue of the illustrations provided by plaintiff. The Court found that, unlike those works consisting of music and lyrics, which must be performed together for

there to be a song, *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266 (2d Cir. 1944), and photographs and explanatory text, which must be published between the same covers for a picture book to convey its message, *Donna v. Dodd, Mead & Co.*, 374 F.Supp. 429 (S.D.N.Y.1974), the Stratemeyer stories could be enjoyed in full without the illustrations provided by plaintiff (which were created pursuant to Syndicate specifications).

In sum, the Court decided that the text and illustrations in the books are not "inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Furthermore, Syndicate did not intend that its stories be "subsumed into [a] joint effort." *Donna v. Dodd, Mead & Co., supra*, 374 F.Supp. at 430. Rather, the parties' intention was that the illustrations be included to enhance the attractiveness, for marketing purposes, of Grosset-published books containing separable, independently readable Stratemeyer stories. *See also Picture Music, Inc. v. Bourne, Inc.*, 314 F.Supp. 640, 653 (S.D.N.Y.1970), *aff'd*, 457 F.2d 1213 (2d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972) (additions "too insubstantial" to induce owner to share copyright).

### 2. Divisibility of copyright and copyright in characters

Syndicate granted plaintiff an exclusive license to publish certain books. Thus, the Court found that, under the principle of divisibility of copyright, *see* 17 U.S.C. § 101 and *Photo-Drama Motion Picture Co. v. Social Uplift Film Corp.*, 220 F. 448, 450 (2d Cir. 1915), plaintiff may very well have a "copyright ownership" in the rights it *was* granted. This copyright ownership, however, could extend only to the exclusive publication rights for the individual books published by plaintiff. Plaintiff was never granted any copyright interest in any series of Stratemeyer stories or in the characters on which the series are based. Thus, plaintiff had no standing to sue anyone for copyright infringement over the publication of new stories in the Stratemeyer series be-

yond those published by plaintiff. *Newman v. Thomas Y. Crowell, Publishers*, 205 U.S. P.Q. 517, 518 (S.D.N.Y.1979). Because plaintiff thus also had no standing to sue for infringement of copyrights in characters in the Stratemeyer series, the Court did not reach the issue of the copyrightability of these characters.

### 3. Works for hire

Because there was no controversy before the Court in connection with an attempted termination of any copyright transfer or license under § 304(c) of the Copyright Act, 17 U.S.C. § 304(c), the Court did not determine which, if any, of the Stratemeyer series were works made for hire.

### *Discussion*

Under section 505 of the Copyright Act of 1976, 17 U.S.C. § 505, the Court is authorized to exercise its discretion to award "to the prevailing party a reasonable attorney's fee as part of the costs." This Circuit has consistently interpreted this statutory provision as "a departure from the normal practice of not permitting assessment of attorneys' fees as costs," *Breffort v. I Had a Ball Co.*, 271 F.Supp. 623, 627 (S.D.N.Y. 1967), and thus as a form of penalty against a losing party, *Rose v. Bourne, Inc.*, 176 F.Supp. 605 (S.D.N.Y.), *aff'd*, 279 F.2d 79 (2d Cir.), *cert. denied*, 364 U.S. 880, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960). Accordingly, this statutory provision has been "sparingly used and the amounts awarded modest." *Orgel v. Clark Boardman Co.*, 301 F.2d 119 (2d Cir.), *cert. denied*, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962).

This Circuit has also consistently distinguished the award of counsel fees under 17 U.S.C. § 505 to a prevailing plaintiff from the same award to a prevailing defendant. *See Breffort v. I Had a Ball Co., supra*, 271 F.Supp. at 627; *Davis v. E. I. DuPont de Nemours & Co.*, 257 F.Supp. 729 (S.D.N.Y. 1966) (per Feinberg, J.). When attorneys' fees are awarded to a prevailing plaintiff, the statutory provision fulfills its purpose as an added deterrent against copyright infringement. *Breffort v. I Had a Ball Co.*,

*supra*, 271 F.Supp. at 627; *Nom Music, Inc. v. Kaslin*, 227 F.Supp. 922, 928 (S.D.N.Y. 1964), *aff'd*, 343 F.2d 198 (2d Cir. 1965). When a defendant has prevailed, however, attorneys' fees will only be awarded under the statute if, in exercising its discretion, the court finds plaintiff's suit to have been baseless, frivolous, unreasonable, or brought in bad faith.[1] *Edward B. Marks Music Corp. v. Continental Record Corp.*, 222 F.2d 488 (2d Cir.), *cert. denied*, 350 U.S. 861, 76 S.Ct. 101, 100 L.Ed. 764 (1955); *Wainwright Securities Inc. v. Wall St. Transcript Corp.*, 80 F.R.D. 103 (S.D.N.Y.1978); *Gardner v. Nizer*, 396 F.Supp. 63, 64 (S.D.N.Y.1975); *Breffort v. I Had a Ball Co.*, *supra*, 271 at 628.[2]

The standards that guide a determination of whether to grant a discretionary award frequently elude precise definition. The Court's decision of whether to exercise its discretion to award attorneys' fees under § 505 to a prevailing *defendant* is particularly difficult, because the standards of "bad faith," "groundless," and "frivolous," are themselves so inherently subjective and difficult to define. The courts that decline to award attorneys' fees to prevailing copyright defendants—and most of the courts faced with prevailing copyright defendants *do* decline to award attorneys' fees—tend, quite legitimately, to conclude simply that the suit "does not appear to have been 'frivolous' or to have been brought in 'bad faith.'" *Gardner v. Nizer, supra*, 396 F.Supp. at 64. This decision is, in the final analysis, one that each court must make in its discretion on the facts of the case before it. However, one can get some sense of the boundary between suits that are frivolous and those that are not by examining cases that fall in each of these categories.

One of the few examples in which attorneys' fees were awarded to a prevailing defendant is *Mailer v. R.K.O. Teleradio Pictures, Inc.*, 332 F.2d 747 (2d Cir. 1964). In that case, plaintiff brought suit against a film company, arguing that the production of a feature length photoplay from his novel had not been completed by the cut-off date provided for by contract, that the rights therefore reverted to him pursuant to the proviso, and that the defendant's continued production and distribution of the movie was an infringement of his copyright.

The trial court found that, by the time of the cut-off date, the movie had been completed and even exhibited to major motion-picture chain executives. Minor changes had been made subsequent to the cut-off date, but, the court ruled, the purpose of the reversionary clause was not to foster a suit for such minor changes but rather to ensure that the producer would not subsequently decide to abandon the proposed film. Thus, the court ruled, the clause had fulfilled its objective by the cut-off date, and accordingly the court rendered judgment for the defendants.

The trial court awarded attorneys' fees to defendants under 17 U.S.C. § 116 (the predecessor of § 505), finding that the claim was not synthetic or capricious, but that it was unreasonable. In affirming this award, Judge Kaufman wrote:

'this was not a case of piracy of a literary work, or the unqualified refusal to recognize the validity of a copyright,' but rather represented an attempt by Mailer to employ a highly technical argument as a means of extracting a grossly unfair penalty assessment from the defendants. After examining the record in this proceeding, we find the inference inescapable that Mailer, disappointed in the fail-

---

1. This result is logical. There is no need to award attorneys' fees to a prevailing defendant in order to further the statutory fee provision's purpose of deferring infringement, because there *is* no finding of infringement when a defendant has prevailed. The courts have, however, articulated a "frivolous" or "bad faith" standard in order to award attorneys' fees to prevailing defendants under § 505. One can see that these courts have in effect pro-

pounded the general equitable standard of "bad faith" that is used to award attorneys' fees in the absence of statutory provision for such fees. *See Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975).

2. Attorneys' fees were denied to the prevailing defendants in each of these cases.

ure of the film to return the expected profits, merely sought to recover those profits in the form of a judgment, or, more likely, a substantial settlement. . . . This sort of litigiousness cannot be condoned. Under the circumstances, the moderate counsel fee awarded [$5000] was entirely proper.

332 F.2d at 749–50.[3]

In contrast, the Court refused to award attorneys' fees to a prevailing defendant in *Italian Book Corp. v. American Broadcasting Co.*, 458 F.Supp. 65 (S.D.N.Y.1978). In that case, a music publisher brought an action against a television broadcaster for copyright infringement. The alleged infringement occurred when an ABC–TV news film crew, covering the San Gennaro Festival, filmed a parade which included a float upon which a band was playing. Portions of the band music were recorded, formed a part of the TV film strip, and were broadcast on the Channel 7 news that evening. The band music contained at least a portion of the plaintiff's song. Plaintiff stipulated that this broadcast did not result in any actual damage, and limited its claim to the statutory damages of 17 U.S.C. § 101(b).

The trial court dismissed the complaint, finding that ABC's use of the work in question was privileged under the doctrine of fair use. Nonetheless, the court refused to award attorneys' fees to the prevailing defendant, finding that plaintiff's claim, "while ultimately unsuccessful, was brought in good faith." 458 F.Supp. at 72. The Court also took into account the relative financial resources of the parties.

The case before this Court does not approach the unreasonableness exhibited in *Mailer*. If its facts presented a situation somewhere between the "unreasonableness" of *Mailer* and the "good faith" of *Italian Book*, the instant case would still be difficult. However, the Court finds plaintiff's copyright claims no more unreasonable than those in *Italian Book* or in the other cases in this Circuit in which fees have been denied.[4]

No one factor has compelled the Court to reach this decision. As noted earlier, discretionary determinations of this kind are among the most difficult to articulate. Although some of the claims were perhaps ill-advised, they do not rise to the level of bad faith or frivolousness. This case presented an extremely complex factual situation, one which included 50-year-old agreements and a course of dealing between the parties over that 50-year period involving some 500 books. The legal rights of the parties after 50 years of their type of business dealings were definitely open to differing interpretations; against this background, the copyright claims do not seem unwarranted, much less frivolous or unreasonable. Under these circumstances, the Court would be abusing its discretion under 17 U.S.C. § 505 if it were to award attorneys' fees.

In sum, the Court, upon review of the entire record, is not persuaded that plaintiff's copyright claims were "frivolous," "unreasonable" or "instituted in bad faith" as required for an award of attorneys' fees to prevailing defendants under 17 U.S.C. § 505. The Court therefore refuses to exercise its discretion to make such an award. Accordingly, defendants' motion is denied, and the heretofore undecided portion of plaintiff's motion is granted. The Court's earlier determination to award attorneys' fees to defendants is vacated.[5]

---

**3.** Thus, Mailer had utilized the copyright system in a distorted way to try to provide a remedy for his troublesome contractual argument. One can read the award of fees not just as a penalty for an unreasonable copyright suit, but as a penalty for one that subverted the integrity of the copyright system. It is interesting to note that this extreme behavior did not even warrant a finding of "bad faith"; the court awarded fees on the basis of "unreasonableness." Nonetheless, the above-quoted sentences describe Mailer's conduct in classic terms of bad faith, which is the basis for fee awards under the general equitable standard. See note 1, *supra*.

**4.** See text and note at note 2, *supra*.

**5.** In order to make an attorneys' fees award, a court must decide (1) whether an award of fees is justified in the first instance; and (2) if it is justified, whether the amount of fees claimed has been factually substantiated. Pursuant to

Costs shall be taxed against plaintiff. It is so ordered.

the Court's earlier determination that an award of attorneys' fees was justified, defendants' attorneys submitted papers in which they sought the amount charged in connection with this litigation as a whole, which totalled over $400,000. By a letter dated March 25, 1981, the Court requested that the Proskauer firm provide additional information to substantiate the amount of the award claimed. Specifically, the Court asked for "a breakdown separating the amount of attorneys' fees associated with the copyright aspects of the case (*i.e.*, the joint copyright, divisibility of copyright, and works for hire issues) from the fees for the balance of the litigation." In addition, the Court requested "an affidavit detailing the hours spent, the hourly rate charged, and how the time was spent, for each of the attorneys and summer associates listed in exhibit A attached to [defendants'] September 22, 1980, affidavit, with the time spent for the copyright and non-copyright portions of the litigation listed separately. *See, e.g., Kane v. Martin Paint Stores, Inc.*, 439 F.Supp. 1054 (S.D.N.Y.1977), *aff'd mem.*, 578 F.2d 1368 (2d Cir. 1978)." The Court received a supplemental affidavit and exhibits in response to its request. Given today's decision that an award of attorneys' fees is not justified, the Court does not reach the second prong of its fee determination, namely, whether the defendants' attorneys have, by their supporting papers, adequately substantiated an amount of fees attributable to defending the statutory copyright claims made in this litigation.